IN THE CIRCUIT COURT OF THE ~~TWENTIETH JUDICIAL CIRCUIT~~

IN AND FOR HENDRY COUNTY, FLORIDA

HARRISON BRADLEY CUNNINGHAM, Plaintiff,

v.

CASE NO.: _____     2:26- cv - 2087 - SPC-KRH

HENDRY COUNTY SHERIFF, in his official capacity,

Defendant.

_____/

**VERIFIED CIVIL RIGHTS COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Harrison Bradley Cunningham, by and through himself, sues Defendant Hendry County

Sheriff, in his official capacity, and alleges:

# IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT

# IN AND FOR HENDRY COUNTY, FLORIDA

## SECOND AMENDED VERIFIED CIVIL RIGHTS COMPLAINT AND DEMAND FOR JURY TRIAL

The Plaintiff, Harrison Bradley Cunningham, by and through himself, files this Second Amended Verified Civil Rights Complaint against Defendant, Steve Whidden, Sheriff of Hendry County, in his official capacity. This operative complaint fully consolidates and incorporates newly discovered evidence, detailed empirical and statistical data, policymaker statements, documented psychiatric and physical impairments, specific operational interactions, a distinct pattern of targeted law enforcement retaliation, and the critical constitutional, statutory, and evidentiary grounds formally asserted, challenging the initial warrantless seizure, lack of objective body-worn camera recording, and non-Mirandized custodial interrogation under severe duress.

This pleading establishes municipal liability under *Monell v. Department of Social Services* and demonstrates a systemic, punitive, and highly coercive operational environment within the Hendry County Sheriff's Office ("HCSO"), brought before this Court following Plaintiff's Leave to File and accompanying Consolidated Omnibus, Evidentiary, Medical/Mitigation, Dismissal/Suppression, and Unlawful Seizure/Interrogation Notices pursuant to Federal Rules of Civil Procedure 15(a)(2) and 60(b). In support thereof, Plaintiff alleges as follows:

## I. INTRODUCTION

1. This is a civil rights action for damages, declaratory, and injunctive relief brought pursuant to 42 U.S.C. §§ 1983 and 1988 to redress the deprivation of Plaintiff's rights secured by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 9, 12, and 16 of the Florida Constitution.

2. Plaintiff explicitly states and contends that his constitutional rights were severely and systematically violated by the Defendant through selective enforcement, unconstitutional pre-trial detention, manufactured stops, warrantless vehicle blockades lacking independent reasonable suspicion, interference with the right to record law enforcement officers, systemic prosecutorial and charge manipulation, and targeted retaliatory harassment designed to suppress the exercise of his constitutional rights.

3. Plaintiff further alleges that these investigative and law enforcement violations were compounded by a systemic collapse of operational standards and unconstitutional conditions of confinement while held as a pretrial detainee at the Hendry County Jail, including objective over-capacity housing, dangerous multi-celling configurations, severe operational indifference to persistent environmental hazards, a total failure to protect detainees, and a systemic failure to accommodate serious physical, medical, and psychiatric needs.

4. This case is to be opened following the discovery of material, non-cumulative evidence, concealed internal practices, and parallel developments that directly undermine the baseline assumptions of the Court's prior dismissal. This framework is integrated herein to prevent a manifest injustice, ensure adjudication on a complete factual record, and

address ongoing public interest concerns regarding local law enforcement compliance, supported by an administrative complaint filed with the U.S. Department of Justice Civil Rights Division and verified by the Plaintiff on April 23, 2026.

## II. JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3), as this action is brought pursuant to 42 U.S.C. § 1983 to redress constitutional violations by local authorities.

6. Venue is proper in the United States District Court for the Middle District of Florida, Fort Myers Division, pursuant to 28 U.S.C. § 1391(b), because all unlawful acts, unconstitutional enforcement actions, municipal practices, and physical conditions alleged herein occurred within Hendry County, Florida, which sits within this federal judicial district.

## III. PARTIES

7. Plaintiff Harrison Bradley Cunningham is an adult male citizen who was, at all times material, subjected to law enforcement actions by the Hendry County Sheriff's Office and subsequently held in custody as a pretrial detainee at the Hendry County Jail.

8. Defendant Steve Whidden is the elected Sheriff of Hendry County and the statutory custodian of the Hendry County Jail. He is the final policymaker for HCSO and is legally responsible for the operations of the Hendry County Jail, the safety of all detainees, and the policies, customs, official practices, training, budgeting, and staff supervision within the agency. He is sued in his Official Capacity.

## IV. FACTUAL ALLEGATIONS

**The Unlawful Seizure, Vehicle Blockade, and Lack of Objective Recording**

9. **Absolute Factual Innocence and Digital Alibis:** Plaintiff maintains his absolute innocence regarding the underlying charges of trespassing at Mrs. Reese's property. Metadata from RuneScape servers, Discord chats, and YouTube video history conclusively establishes the exact minutes Plaintiff was active on his home computer, proving he could not have been present at the alleged date and time claimed by the Sheriff's office. Plaintiff further maintains his absolute innocence regarding charges of stalking Mr. Ridderman. Mr. Ridderman's claim that Plaintiff was a disgruntled ex-employee is a complete fabrication constituting perjury.

10. **Undocumented Labor Patterns and Institutional Conflicts:** Plaintiff was never hired as a formally documented employee by Mr. Ridderman; rather, Mr. Ridderman operated an informal labor arrangement, paying Plaintiff under the table and off the books alongside two other individuals known as John Doe 1 and John Doe 2. This lack of formal employment is corroborated by insurance records following a workplace incident where Plaintiff slid down a vaulted rooftop, nearly falling from a dangerous height before being caught by a dryer vent. Plaintiff requests Mr. Ridderman's false testimony misrepresenting this arrangement be stricken from the record.

11. At all times material, a structural conflict of interest existed between Mr. Ridderman and Defendant Steve Whidden. Mr. Ridderman maintains an ongoing, unrecorded business relationship with the Hendry County Sheriff's Office and/or its individual deputies, exchanging detailing services on the Sheriff's official and personal agency vehicles. While compensated in this unrecorded, under-the-table fashion, Plaintiff personally

detailed the vehicles of various Sheriff's deputies. By virtue of this commercial relationship, HCSO possessed an institutional bias to protect its business associate, credit his fabricated allegations, and actively ignore exculpatory evidence favoring the Plaintiff.

12. **The Warrantless Blockade and Show of Authority:** On the date of the encounter with Lt. Hudson, Plaintiff was traveling lawfully on his bicycle, when Lt. Hudson initiated a warrantless contact by operating an unmarked vehicle and deliberately positioning that vehicle directly into Plaintiff's path of travel, physically obstructing his forward movement and preventing departure. At no time did Lt. Hudson activate emergency lights or sirens, nor did he otherwise conduct the encounter in a manner consistent with a standard, lawful traffic stop.

13. Instead, Plaintiff was confronted with an immediate, sudden physical blockade and barrier, creating an unmistakable show of authority, ambiguity, and intimidation rather than a recognizable, lawful police encounter. This tactic placed Plaintiff in a position where compliance was compelled not by lawful authority properly exercised, but by sudden physical obstruction and implied force, creating an inherently coercive environment that completely restrained his freedom of movement.

14. **Absence of Founded Suspicion at Inception:** At the precise moment Lt. Hudson blocked Plaintiff's path and restricted his movement, a warrantless seizure and investigatory detention had occurred under controlling law, as a reasonable person under these circumstances would not have felt free to ignore the officer, terminate the encounter, or leave the scene (*Popple v. State*; *Golphin v. State*). At that point of inception, prior to any actual investigation or observation of criminal activity, Lt. Hudson completely lacked any articulable facts or founded suspicion to support the detention

(*Baptiste v. State*). Any observations, conclusions, or alleged statements formed after this unlawful physical detention cannot retroactively justify the seizure.

15. **Total Absence of Body-Worn Camera Evidence:** Compounding this constitutional violation, Lt. Hudson was not equipped with, or completely failed to activate, a body-worn camera during the entirety of this critical initial encounter. As a result, there exists no objective recording of the manner in which Plaintiff's path was blocked, the officer's initial approach, tone, or any statements made prior to questioning.

16. Because the legality of the stop hinges entirely on those precise initial moments, the deliberate or negligent failure to preserve objective evidence leaves the record completely stripped of corroboration, forcing an reliance on an officer's subjective account, depriving the reviewing bodies of critical evidence, and preventing meaningful judicial review of whether the field encounter was unconstitutionally coercive.

**Custodial Interrogation Without Miranda Warnings and Fruits of the Poisonous Tree**

17. **Non-Mirandized Custodial Interrogation:** Following the unlawful warrantless detention, and while Plaintiff's freedom of movement remained effectively restrained by the unmarked vehicle's positioning and authority, Lt. Hudson immediately engaged Plaintiff in questioning that was explicitly investigatory in nature and reasonably likely to elicit incriminating responses.

18. At no point prior to or during this interrogation was Plaintiff advised of his constitutional rights pursuant to *Miranda v. Arizona*. Because his freedom of movement had been restricted through physical blockage and a sudden show of force, Plaintiff was in a state of custody for purposes of *Miranda* under an objective test (*Ramirez v. State*). When asked by law enforcement if he thought he was funny, Plaintiff responded in the

affirmative, indicating it was hilarious, after which Lt. Hudson called Plaintiff a liar. Agency personnel actively utilized this unrecorded, ambiguous setting to conduct a fishing expedition for a confession, interfering with Plaintiff's concurrent attempts to document and record the public actions of the officers.

19. **Fruit of the Poisonous Tree:** Because the physical detention was completely unlawful from its inception and the subsequent questioning violated the Fifth Amendment, any statements obtained from Plaintiff—and any derivative observations, field evidence, or testimony derived from those statements—are constitutionally tainted and inadmissible under the fruit of the poisonous tree and exclusionary doctrines (*Wong Sun v. United States*).

20. There are no intervening circumstances, breaks in the chain of custody, or structural factors sufficient to attenuate or purge the taint of the illegal stop (*Brown v. State; Bailey v. State*). Lt. Hudson's anticipated actions, investigative observations, and reports are inseparably tied to the illegal blockade, the coercive detention, and the non-Mirandized interrogation. Allowing such tainted accounts to stand places evidence obtained in direct violation of constitutional protections before judicial bodies, fundamentally undermining the integrity of the adversarial process and causing substantial prejudice to the Plaintiff's rights.

## Targeted Retaliatory Harassment and Prosecutorial Manipulation

21. **Post-Filing Retaliation and 4 AM Fishing Expeditions:** Following the formal filing of Plaintiff's federal civil rights litigation, agency personnel initiated a targeted campaign of harassment designed to generate pretextual charges out of everyday legal activities. Specifically, Sgt. Nestor Echevarria and Deputy Michael Alfonso—officers directly

implicated and named in Plaintiff's legal challenges—have repeatedly engaged in early morning "fishing expeditions" to intimidate Plaintiff.

22. As an execution point of this custom, these officers lay in wait at a local 7-11 convenience store at approximately 4:00 AM, unconstitutionally seizing Plaintiff and issuing a bad-faith bicycle ticket. This pattern of targeted policing is deployed as an administrative mechanism to manufacture a continuous cycle of "disorderly conduct" or "stalking" charges to undermine Plaintiff's credibility and penalize his access to the courts.

23. **Strategic Charge Manipulation:** This targeted enforcement works in tandem with systemic procedural manipulation to bypass core constitutional protections, including the right to a speedy trial under the Sixth Amendment and the Florida Constitution. When Plaintiff formally asserted his right to a speedy trial on an underlying Trespassing charge, the state mechanism adapted by altering the charge to "Disturbing the Peace" for the explicit purpose of resetting the statutory speedy-trial clock, only to subsequently switch the charge back to Trespassing. This cycle of bad-faith adjustments constitutes a systemic evasion of due process, which only ceased when documentary evidence forced a dismissal of the initial case.

24. **Coercive Carceral Dynamic and Involuntary Actions:** The agency utilizes the structural threat of high, unconstitutional bail structures, repetitive prosecution alterations, and placement within hazardous jail environments to systematically force signatures, waivers of rights, and involuntary agreements from innocent detainees. This dynamic subjects citizens to a life-threatening, intensely coercive environment where they must choose between submitting to a fabricated record, risking physical violence

from officers, or experiencing a severe psychiatric breakdown under the weight of the conditions of confinement.

25. **Institutional Indicators of Non-Neutrality:** Plaintiff alleges that these pervasive practices reflect an institutional framework within Hendry County where objective constitutional metrics are subverted by a rigid, non-neutral hierarchy. The overt display of symbolic indicators on the structural architecture of the detention facility itself serves as a functional notification of an alternate, insular system of authority, communicating to non-members that standard constitutional separations of power and neutral protections of law have been effectively displaced.

## Pretrial Booking, Severe Environmental Hazards, and Cosmetic Remediation

26. In January of 2025, Plaintiff Harrison Bradley Cunningham was booked into the Hendry County Jail as a pretrial detainee. As a pretrial detainee, Plaintiff maintained a constitutional presumption of innocence and could not lawfully be subjected to conditions of confinement or law enforcement procedures that amount to pretrial punishment under the Fourteenth Amendment.

27. **Pervasive Environmental Neglect:** Defendant Whidden has allowed overcapacity, dust to remain in the facility's HVAC system, and mold in the housing units(showers).

28. Despite Plaintiff filing formal administrative grievances regarding these conditions, jail administration has performed only superficial, "cosmetic remediation" consisting of painting over the visible mold. This environment exposed Plaintiff to poor overall air quality and heavy accumulations of airborne dust and spores, causing immediate respiratory distress and triggering his sinus infection in C-Pod. These environmental hazards were met with delayed medical attention by jail staff asking Plaintiff to file a

medical form on tablets that are rarely shared if it all. Inmates are known to "buy" tablets or have one assigned to them by the controlling groups in the general population. Personal tablets are virtually non-existent for legal research and self education, since it is so hard to get one for each room such as in B-Pod.

## Chronology of Over-Capacity Housing Assignments and the Muniz Homicide

28. **Pattern of Overcrowding and Triple-Bunking:** Defendant Whidden has maintained a systemic policy and custom of "triple-bunking" and overcrowding cells designed to hold only two persons. Plaintiff was initially transferred to an over-capacity cell within the housing blocks (B-Pod) containing only two elevated bunks but already housing two other inmates. Because the cell was occupied to its capacity, jail personnel directed Plaintiff to sleep on the floor. This configuration forced Plaintiff to sleep directly on the floor adjacent to the cell's toilet facilities in unsanitary and highly restricted conditions for approximately 24 hours.

29. Plaintiff was subsequently transferred to A-Pod, where he was again required to sleep on a metal floor mattress tray (a plastic "boat") and later the bare floor of the housing unit. He was ordered to move out of the boat so an incoming inmate could utilize the space. He was housed in a new room by the inmates in a certain group and given tokens of good faith because questions were being raised by the inmate population regarding why Plaintiff was ordered to move out.

30. Plaintiff was subsequently moved into the general population, at which point he was provided a metal floor mattress tray ("boat") upon which to sleep. The consecutive time during which Plaintiff was required to sleep directly on the floor underneath a bunk caused him severe pain, physical degradation, persistent sleep disruption, and profound

sleep deprivation. This stay on the floor lasted for several days and nights in a four-man cell where Plaintiff was placed as the fifth occupant on the floor, while guards conducted counts as if the configuration complied with normal operational limits.

31. Defendant, through jail staff (including Sgt. Monkdragon), failed to provide an elevated bunk or alternative accommodations, demonstrating deliberate indifference to a substantial risk to Plaintiff's health, safety, and due process rights. The physical degradation of these floor assignments was significantly amplified because Plaintiff has a relevant medical and surgical history involving a prior radical orchiectomy, which drastically increased the severity of his physical anguish and required specific structural accommodation that jail staff ignored.

32. **The Muniz Homicide ("The Smoking Gun"):** On March 10, 2025, the systemic failure to supervise, understaffing, and operational neglect maintained by Defendant Whidden reached a catastrophic peak. Inmate Nickolas Damien Muniz was killed during a prolonged assault inside the housing blocks. Plaintiff was a witness to this severe operational incident via physical proximity and direct audio observation, which caused severe psychological trauma to the Plaintiff. Prior to losing his life, Nikolas Muniz had given Plaintiff a deck of cards containing information on cold cases. Following the incident, detectives investigating the homicide interviewed Plaintiff, and Plaintiff participated fully with the investigative team.

33. **Retaliatory and Traumatic Housing Assignment:** Following the homicide and subsequent detective interview, jail personnel directly transferred Plaintiff into the specific cell where the Nikolas Muniz homicide had occurred. This caused severe distress, as Plaintiff believed he was highly fortunate to have avoided a dangerous

confrontation with the individual responsible for the incident ("Michael"). Upon entry into the cell, and for a duration of time thereafter, the chemical smell of cleaning supplies utilized to remediate the cell scene remained heavily present in the air, exacerbating his chronic asthma.

34. **Failure to Protect and Classification Breakdown:** Jail staff additionally placed Plaintiff into the General Population despite his explicit request to be "Kept Away" from a specific group of people in the jail, including an individual with whom Plaintiff had been involved in a prior physical altercation outside the facility. Said individual had previously struck Plaintiff in the face with a closed fist while intoxicated after accusing Plaintiff of "investigating" him. Upon entry to the jail, Plaintiff requested separation from this individual, yet was subsequently housed with him by chance in general population for approximately 24 hours before the individual bailed out. This complete breakdown in classification and supervision mirrors the fatal failures present in the concurrent litigation of *Daniels v. Hendry County Jail* (Case No: 2:2025cv00026).

35. Plaintiff exhausted his administrative remedies by making explicit grievances to his mother detailing the over-capacity triple-celling, the failure to protect, the physical toll of the floor-sleeping assignments, and the medical issues during recorded phone calls.

### Severe Medical Impairments, Clinical Over-Medication, and Institutional Coercion

36. **History of Psychiatric and Physical Impairments:** Plaintiff suffers from medically determinable psychiatric impairments and chronic physical pain requiring ongoing treatment, including prescribed psychiatric medications since approximately 2021. These impairments were initially triggered by severe psychosocial stressors and have since been

severely and materially exacerbated by governmental interactions, sudden involuntary commitments under Florida's Baker Act, and systemic carceral conditions.

37. **Cognitive and Executive Deterioration via Over-Medication:** The unconstitutional, retaliatory, and deliberately indifferent conduct of the Defendant, as detailed herein, directly caused a catastrophic deterioration in Plaintiff's cognitive functioning, emotional regulation, mental stability, and executive capacity. During periods relevant to judicial interactions, formal statement procurement, and the entry of highly pressured waivers or pleas, Plaintiff's cognition, judgment, and volitional control were drastically and clinically impaired by heavy therapeutic doses of psychotropic medications administered within the institutional environment, specifically including *Seroquel* (quetiapine) and *Prozac* (fluoxetine).

38. **Clinical Functional Deficits:** This government-caused aggravation, clinical over-medication, and severe psychological duress induced a clinical state of diminished capacity, characterized by severe deficits in concentration and attention, persistent cognitive fog, intense emotional dysregulation affecting impulse control, and a severe impairment in his ability to plan, organize, process information, or complete tasks. This chronic mental and physical suffering forms a reinforcing loop of diminished functioning, drastically reducing Plaintiff's capacity to comply with complex procedural or legal requirements or exercise rational judgment consistent with legal expectations.

39. **Compounded Institutional Failures:** This structural psychological toll was directly exacerbated by a total breakdown in defensive and investigative infrastructure. While recorded jail telephone calls documented explicit assertions that defensive measures, such as the retention of a private investigator, were actively being deployed to protect

Plaintiff's due process rights, no investigator provided assistance or conducted a meaningful counter-investigation.

40. Forcing Plaintiff to navigate a highly complex adversarial framework while suffering from profound executive dysfunction, heavily medicated under the immediate influence of psychotropic substances, and subjected to the structural threat of continued unconstitutional confinement inside the hazardous jail facility created an intensely punitive, coercive environment. This environment effectively overbore Plaintiff's independent will, rendering his operational choices, waivers, or entered statements legally involuntary, void of intelligent intent, and obtained in total violation of due process.

## Municipal/Monell Policy, Systemic Data, and Pattern and Practice Allegations

41. The constitutional violations suffered by Plaintiff were not isolated, erratic anomalies but were the direct result of systemic policies, customs, patterns, and widespread practices maintained, condoned, or established by Defendant Whidden as the final policymaker.

42. **Empirical Enforcement Disparities (2013–2023):** Longstanding tracking data within Hendry County confirms that law enforcement practices are shaped by measurable racial and ethnic disparities. Specifically, Black individuals are **3.9 times more likely** to be arrested than White individuals, and Latinx individuals are **1.1 times more likely** to be arrested than White individuals relative to similarly situated demographic baselines. These disparities support an inference of selective enforcement and discriminatory impact under the Equal Protection Clause of the Fourteenth Amendment.

43. **Systemic Over-Policing of Low-Level Offenses:** Between approximately 2013 and 2023, approximately **80% of all arrests** executed by HCSO involved low-level,

non-violent offenses. This operational focus demonstrates an institutional custom of prioritizing volume-based policing models over objective public safety measures, establishing the moving force behind the pretextual detention, prolonged stops, targeted bicycle/pedestrian encounters, unmarked vehicle blockades, and repetitive fishing expeditions launched against Plaintiff.

44. **Deficient Oversight and Internal Accountability:** Independent criminal justice evaluations assign HCSO an overall accountability score of approximately **33% (National Grade: F)** regarding misconduct investigations, supervisory tracking, and disciplinary transparency. This chronic failure to supervise or discipline is probative of an institutional environment where structural conflicts of interest, unrecorded commercial relationships (such as that with Mr. Ridderman), and officer misconduct are tolerated. Recent investigations into HCSO leadership and the evidence room have revealed environment-wide failures, including unsecured evidence rooms and evidence tampering, destroying any baseline presumption of regularity.

45. **Falsification of Official Records and Abuse of Power:** The agency's systemic custom of procedural shortcuts and unlawful investigative operations is illustrated by the federal criminal conviction of former HCSO Deputy Tyler Williams on February 12, 2025. Williams was convicted in federal court for violating civil rights and obstructing justice by using excessive force on a handcuffed suspect and subsequently authoring a false police report to justify his actions. This documented practice of writing false justifications to mask constitutional violations establishes that the manufactured stops, lack of written body camera confirmation, and coerced statements directed at Plaintiff were execution points of a broader municipal pattern, custom, and practice.

46. **Socioeconomic and Class Bias:** Publicly documented metrics from the region show that approximately 15.8% of individuals with disabilities lack standard health coverage, and roughly 10% of SNAP recipients are non-elderly individuals with disabilities. This socioeconomic environment intersects directly with public statements and administrative practices territory attributed to law enforcement leadership that target public assistance recipients. Such statements reflect a class-based and disability-based animus, driving biased policing decisions against economically vulnerable or medically compromised individuals, including Plaintiff.

47. **De Facto Budgetary Prioritization:** Defendant Whidden maintains an operational custom and budget model that permits chronic over-capacity housing, unconstitutional triple-bunking, environmental neglect (mold and poor air filtration), and floor-sleeping assignments across pods while directing correctional staff to log standard counts as if the housing units are within lawful constraints. This custom prioritizes budgetary savings over constitutional minimums of safety and sanitation.

This structural negligence has directly manifested in severe, catastrophic outcomes, up to and including the March 10, 2025 homicide of Nikolas Muniz, demonstrating that safety, environmental risks, and supervision were chronically inadequate. Prior civil liability for gross negligence involving a lack of oversight and misuse of confidential informants (*Waddell v. Hendry County Sheriff's Office*) further documents this long-standing custom of wanton disregard for public safety.

## V. CAUSES OF ACTION

**COUNT I: 14TH AMENDMENT VIOLATION**

**(Conditions of Confinement)** *(Against Defendant in Official Capacity under Monell)*

48. Plaintiff realleges paragraphs 1 through 47 as if fully set forth herein.

49. The Due Process Clause of the Fourteenth Amendment prohibits the imposition of conditions of confinement upon pretrial detainees that amount to punishment, ignore serious environmental hazards, or fail to provide basic human minimums of safety, space, and sanitation.

50. Defendant Whidden, in his official capacity as final policymaker, acted with deliberate indifference to the health and safety of Plaintiff by creating, maintaining, or condoning a systemic policy of severe overcrowding, over-capacity triple-bunking, floor-sleeping assignments, and pervasive black and green mold contamination.

51. Defendant had actual and constructive knowledge of these severe physical hazards through formal grievances and administrative tracking metrics, yet failed to implement adequate remediation efforts, opting instead for superficial, cosmetic solutions that failed to address the underlying environmental risk. The cumulative effect of these unconstitutional conditions caused Plaintiff severe physical degradation, sleep deprivation, and chronic respiratory distress.

## COUNT II: 14TH AMENDMENT VIOLATION

**(Failure to Protect)** *(Against Defendant in Official Capacity under Monell)*

52. Plaintiff realleges paragraphs 1 through 47 as if fully set forth herein.

53. Pretrial detainees possess a clearly established constitutional right under the Fourteenth Amendment to be protected from violence and to be housed in a reasonably safe carceral environment with adequate supervision and staffing.

54. Defendant Whidden violated this duty by systematically failing to maintain adequate staffing, classification protocols, and security supervision within the housing pods of the Hendry County Jail. This systemic failure to supervise and protect reached a catastrophic peak on March 10, 2025, during the prolonged assault and homicide of inmate Nickolas Damien Muniz, an event Plaintiff was forced to witness via physical and auditory proximity.

55. Defendant further demonstrated deliberate indifference by failing to adhere to classification separation requests, housing Plaintiff with a known hostile individual, and subsequently placing Plaintiff directly into the cell where the homicide had occurred. This breakdown in basic carceral safety directly caused Plaintiff severe psychological trauma, emotional distress, and a profound deterioration of his mental stability.

**COUNT III: FIRST, FOURTH, FIFTH, SIXTH, AND FOURTEENTH AMENDMENT VIOLATIONS**

**(Warrantless Seizure, Report Falsification, Carceral Coercion, Targeted Retaliation, and Due Process Violations)** *(Against Defendant in Official Capacity under Monell)*

56. Plaintiff realleges paragraphs 1 through 47 as if fully set forth herein.

57. The First, Fourth, Fifth, Sixth, and Fourteenth Amendments, alongside Article I, Sections 9 and 12 of the Florida Constitution, prohibit law enforcement personnel from executing manufactured warrantless vehicle blockades lacking reasonable suspicion, conducting custodial interrogations without *Miranda* advisements, intentionally failing to record critical enforcement actions to evade oversight, and deploying carceral duress and psychotropic medication effects to obtain involuntary legal waivers or statements.

58. Defendant Whidden, through the operational practices of HCSO personnel, maintained an unconstitutional custom of unlawful investigative seizures and structural coercion. This custom manifested in the deployment of unmarked vehicles as physical blockades to compel compliance, a widespread practice of non-recorded field interrogations, targeted early-morning harassment by Sgt. Echevarria and Deputy Alfonso, and the exploitation of Plaintiff's heavily medicated mental state (*Seroquel* and *Prozac*) under the pressure of continued unconstitutional confinement.

59. This municipal custom intentionally weaponized the severe psychological and physical toll of the jail's conditions of confinement and structural accountability failures to systematically overbear Plaintiff's independent volition. This ongoing course of conduct was explicitly designed to compel involuntary confessions or statements, manufacture a baseline criminal record against a previously unblemished history, and penalize his access

to the courts, in direct violation of his fundamental rights to equal protection, assistance of counsel, freedom from self-incrimination, and due process of law.

## COUNT IV: MUNICIPAL LIABILITY

**(Monell Claim for Systemic Policy, Custom, and Practice)** *(Against Defendant in Official Capacity)*

60. Plaintiff realleges paragraphs 1 through 47 as if fully set forth herein.

61. The constitutional deprivations suffered by Plaintiff—including investigative misconduct, manufactured stops, unrecorded warrantless vehicle blockades, non-Mirandized custodial questioning, retaliatory surveillance, charge manipulation, unconstitutional triple-bunking, environmental exposure, and failure to protect—were the direct and proximate result of a de facto policy, custom, or widespread practice maintained, condoned, or established by Defendant Whidden.

62. Defendant Whidden maintained an institutional custom that prioritized operational budgetary savings, administrative shortcuts, unrecorded business alliances, and insular hierarchies over constitutional minimums of safety, supervision, field transparency, and non-retaliatory law enforcement operation. This municipal policy environment served as the moving force behind the violation of Plaintiff's rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments, permitting structural coercion, report falsifications, environmental neglect, unrecorded seizures, and targeted field harassment to manifest as standard agency operations.

## VI. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Harrison Bradley Cunningham respectfully requests this Court enter judgment in his favor and against Defendant, awarding the following relief:

A. **Declaratory Judgment:** An order declaring that the conditions of confinement, overcrowding policies, unrecorded warrantless field blockade customs, institutional coercion models, retaliatory law enforcement practices, and operational customs at the Hendry County Jail and Sheriff's Office are unconstitutional and violate the United States Constitution and the Florida Constitution;

B. **Permanent Injunction:** An order granting a permanent injunction compelling the Defendant to perform professional, structural mold remediation, comply with constitutional minimum standards for detainee housing, implement lawful classification safeguards, establish strict monitoring of facility-administered psychotropic medical effects during active litigation windows, and enjoin HCSO personnel from engaging in ongoing retaliatory field harassment and bad-faith surveillance against Plaintiff;

C. **Exclusionary Relief:** An order suppressing, striking, and excluding any and all evidence, statements, or involuntary waivers obtained through or derived from the alleged unlawful detentions, unmarked vehicle blockades, non-Mirandized interrogation phases, over-medicated custodial windows, or unconstitutional investigative and retaliatory practices executed against Plaintiff as fruit of the poisonous tree, and prohibiting any testimony based on such tainted items;

D. **Compensatory Damages:** An award of compensatory damages against Defendant for physical pain, suffering, psychiatric/medical degradation, economic injury, reputational harm, and emotional distress;

E. **Punitive Damages:** An award of punitive damages against responsible individual actors as permitted under federal law for conduct demonstrating reckless or callous indifference to federally protected rights;

F. **Fees and Costs:** An award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

G. **Other Relief:** Any such other and further relief as this Court deems just, proper, and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## VERIFICATION

I, HARRISON BRADLEY CUNNINGHAM, hereby declare under penalty of perjury that the foregoing facts are true and correct to the best of my knowledge and belief.

Dated this 16th day of June, 2026.

**Respectfully submitted by, Harrison Bradley Cunningham, Designated Lead Counsel**

*Plaintiff Pro Se*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished to the court via mail on this [ ] day of [    ], 2026.

Signature:

## NOTARY BLOCK

SWORN TO AND SUBSCRIBED before me this 22nd day of June , 2026, by Harrison Bradley Cunningham, who is:

☐ Personally known to me
☒ Produced identification: FL Drivers License

_____

Notary Public, State of Florida

My Commission Expires: 10/04/2028

Notary Public State of Florida
Jordan Robert Esparza
My Commission  HH 593115
Expires  10/4/2028

## CERTIFICATION REGARDING THE USE OF GENERATIVE ARTIFICIAL INTELLIGENCE

The undersigned hereby certifies that generative artificial intelligence was used in the preparation of this  Document. The undersigned further certifies that every citation to the law, every factual assertion, and all legal analysis contained in this filing has been independently verified for accuracy and completeness. The undersigned understands that personal responsibility for the integrity of this filing remains with the filer, regardless of any AI assistance.